IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILIP NICOLA,

    Plaintiff,　　　　　　　　　　　No. 2:08-cv-01662 KJN

    v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,　　　　ORDER

    Defendant.
_____/

    Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act ("Act"). In his motion for summary judgment, plaintiff principally contends that the Administrative Law Judge ("ALJ") in this case erred by: (1) rejecting the opinion of one of plaintiff's treating physicians without a legitimate basis for doing so; (2) failing to properly assess plaintiff's residual functional capacity as a result of the improper rejection of that treating physician's opinion; and (3) failing to utilize the services of a vocational expert. (Dkt. No. 19.) The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary judgment. (Dkt. No. 23.)

    For the reasons stated below, the court denies plaintiff's motion for summary

1

judgment and grants the Commissioner's cross-motion for summary judgment.[1]

I.   BACKGROUND

   A.   Procedural Background

On September 19, 2005, plaintiff filed an application for Disability Insurance Benefits, alleging a disability onset date of October 11, 2003. (Administrative Transcript ("AT") 79-84.) The Social Security Administration denied plaintiff's application initially and upon reconsideration. (AT 62-66, 70-74.) Plaintiff filed a timely request for a hearing, and the ALJ conducted a hearing on plaintiff's claims. (AT 59, 29-53.) Plaintiff, who was represented by counsel, was the only person to testify at the hearing.

In a decision dated November 16, 2007, the ALJ denied plaintiff's application, finding that plaintiff could return to his past work as a driving instructor with some limitations noted in his residual functional capacity.[2] (See AT 13-20.) The ALJ's decision became the final

---

[1] This case was referred to the undersigned pursuant to Eastern District of California Local Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties have voluntarily consented to proceed before a United States Magistrate Judge. (Dkt. Nos. 7, 9.) This case was reassigned to the undersigned by an order entered February 9, 2010. (Dkt. No. 22.)

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq. Generally speaking, Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Under both benefit schemes, the term "disability" is defined, in part, as an "inability to engage in any substantial gainful activity" due to "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. See 20 C.F.R. §§ 404.1520, 404.1571-1576, 416.920, 416.971-976; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Ninth Circuit Court of Appeals has summarized the sequential evaluation as follows:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>
> Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
>
> Step three:  Does the claimant's impairment or combination

decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (AT 3-5.)

### B. Summary of Relevant Medical History and Evidence

At the time of his hearing before the ALJ, plaintiff was 59 years old. (AT 32.) He had worked as a driving instructor, the president and shuttle driver for a transportation company, and then as an "instructor" or care attendant who assisted mentally challenged people live more independently at a group care home. (See AT 32-34.) Plaintiff left his position in the group home after an October 11, 2003 accident in which he tripped and fell over a parking block while carrying laundry and suffered back and neck problems. (AT 34, 201.)

Plaintiff first sought treatment on October 13, 2003, from a chiropractor, Ron Rudometkin, D.C. (AT 34, 140, 149.) Dr. Rudometkin ordered a February 17, 2004 MRI, which revealed: (1) a "mild posterior subluxation[3] of L2 upon L3, which is likely congenital"; (2) a

---

of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

[3] "Subluxation" is defined as "[a]n incomplete luxation or dislocation; although the relationship is altered, contact between joint surfaces remains." Stedman's Medical Dictionary 1856 (Lippincott Williams & Wilkins, eds., 28th ed. 2006).

3

1  "mild bulge of disc posteriorly at L4-5; and (3) no frank disc herniation or spinal canal stenosis."[4]
2  (AT 148, 203.)  Dr. Rudometkin returned plaintiff to modified duty with a limitation of working
3  no more than three hours per day, starting February 19, 2004.  (AT 148.)  He eventually referred
4  plaintiff to James Wallace, D.C., a chiropractor, for a consultative evaluation.  (Id.)

5           On June 16, 2004, Dr. Wallace issued a report based on a consultative
6  examination of plaintiff and review of the medical record.  (AT 141-49.)  He opined that plaintiff
7  had "[m]oderate level degenerative disc disease of the lumbar spine" and had lost 50% of his
8  "pre-injury capacity for lifting, bending, stooping, pushing, pulling, and other activities involving
9  comparable physical effort."  (AT 146.)  Dr. Wallace also stated that plaintiff was precluded from
10 any heavy work.  (Id.)

11          On June 17, 2004, Dr. Rudometkin signed a letter adopting Dr. Wallace's report
12 as accurately reflecting the overall disability levels he had seen in treating plaintiff.  (AT 140.)

13          On August 16, 2004, David M. Perez, D.C., conducted a qualified medical exam,
14 ordered an x-ray, and issued a report dated September 10, 2004.  (AT 150-59, 205.)  Dr. Perez
15 diagnosed plaintiff with: (1) "Chronic retrolisthesis of L2 over L3,"[5] (2) "Chronic facet syndrome
16 at L2/3," and (3) "Chronic pelvic strain/sprain."  (AT 154.)  He concluded that plaintiff was
17 unable to perform activities that required him to "do repeated forward bending, stooping,
18 squatting, lifting >25 lbs or activities of comparable physical effort."  (AT 155 ("Mr. Nicola's
19 disability is consistent with a No Heavy Lifting, Repeated Bending or Stooping work
20 restriction.").)  Dr. Perez opined, however, that plaintiff could still perform the majority of his

---

[4] Lumbar spinal stenosis is the "narrowing of the lumbar spinal canal, which produces pressure on the sciatic nerve roots (or sometimes the cord) before their exit from the foramina, causing positional back pain and symptoms of nerve root compression."  Mark H. Beers, M.D., et al., eds., The Merck Manual of Diagnosis and Therapy 328 (Merck Research Laboratories, 18th ed. 2006).

[5] Retrolisthesis is the opposite of spondylolisthesis, which refers to the "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum."  See Stedman's Medical Dictionary at 1813; see also id. at 1685 (defining the prefix "retro" as "[b]ackward or behind").

1  duties at the group home.  (Id.)

2  On November 11, 2005, Steve McIntire, M.D., performed an orthopedic
3  evaluation of plaintiff.[6]  (AT 169-72.)  He diagnosed plaintiff with "[p]robable
4  osteoarthritis/degenerative disc disease of lumbar spine," and he "[q]uestion[ed] history of
5  vertebral fracture."[7]  (AT 171.)  After detailing his examination findings, Dr. McIntire
6  summarized plaintiff's functional limitations:

> Given the loss of range of motion [of the lumbar spine], the claimant would have functional limitations.  He would be limited in terms of heavy lifting or carrying activities to not more than 20 pounds frequently or 40 pounds occasionally.  The current examination itself does not point to additional specific functional limitations.  There are not limitations in terms of time sitting, standing or walking.  There are not postural or manipulative limitations suggested by the present examination.

11 (AT 172.)

12  On December 19, 2005, a State agency physician reviewed the record and
13  completed a functional capacity form regarding plaintiff.  (AT 173-80.)  That physician
14  concluded that plaintiff:  could lift up to twenty pounds frequently and forty pounds occasionally;
15  could stand, walk, and sit for six hours in an eight-hour workday; was not restricted in terms of
16  pushing or pulling; and had no postural, manipulative, visual, communicative, or environmental
17  limitations.  (AT 174-77.)  A second agency physician reviewed the functional capacity form and
18  "affirmed" it as written.  (AT 180.)

19  Plaintiff saw Gregory Dixon, M.D., a treating physician, from February 2006
20  through April 2007.  (See AT 195-201.)  On April 30, 2007, after seeing plaintiff over the course

21  ////
22  ////

---

[6] Dr. McIntire stated that he did not possess all of the relevant medical records, including radiographic reports and imaging results, when conducting his review.  (AT 169.)

[7] Plaintiff had reported that he was in a car accident in 1967 and that he had suffered a fractured vertebra.  (AT 169.)

of six visits,[8] Dr. Dixon stated in his treatment notes that his impression was that plaintiff had: "1) cervical C5-6 disc disease[,] 2) left elbow lateral humeral epicondylitis and 3) [degenerative joint disease] of left wrist."[9]  (AT 195.)  Dr. Dixon's notes state that "[t]he patient is to use his neck, back and wrist to pain tolerance and return to see me here on an as needed basis or to call if he has an exacerbation of pain."  (Id.)

That same day, Dr. Dixon filled out a treating source residual functional capacity form for plaintiff.  (AT 187-90.)  In that form, Dr. Dixon listed plaintiff's principal diagnosis as "Cervical C 5-6 (L) disc" and his secondary diagnosis as "Degenerative osteoarthritis (L) wrist," which were based on x-rays and MRIs.[10]  (AT 187.)  He opined that plaintiff had no limitations on standing, walking, or sitting in an eight-hour workday, but stated that plaintiff could only perform light work for only two hours in an eight-hour workday.  (AT 188.)  He further stated that plaintiff had a limitation with respect to forward flexion and frequent rotation of his neck "at all times."  (Id.)  Dr. Dixon further noted that plaintiff could occasionally bend and balance, but could never climb, stoop, crouch, crawl, or kneel.  (Id.)  He further noted that plaintiff could lift and carry one-to-five pounds constantly, and six-to-ten pounds frequently.  (AT 189.)  He stated that plaintiff had limitations in reaching, handling, and fingering, with more limitation in the left hand.  (See id.)  Dr. Dixon also stated that plaintiff needed to lie down frequently, three to four times per day, to relieve neck pain.  (Id.)  He reported plaintiff's chronic pain at a level four of ten, and his worst pain at a level seven of ten.  (Id.)  Finally, with respect to plaintiff's prognosis,

---

[8] Dr. Dixon's treatment notes are in the record (AT 195-201), and are discussed below as necessary.

[9] Epicondylitis refers to the inflammation of an epicondyle, which is a "projection from a long bone near the articular extremity above or upon the condyle."  See Stedman's Medical Dictionary at 653.

[10] On the same day that Dr. Dixon filled out the assessment form, Dr. Dixon's treatment notes reflect a diagnosis of: "1) cervical C5-6 disc disease[,] 2) left elbow lateral humeral epicondylitis and 3) [degenerative joint disease] of left wrist."  (AT 195.)  Epicondylitis refers to the inflammation of an epicondyle, which is a "projection from a long bone near the articular extremity above or upon the condyle."  See Stedman's Medical Dictionary at 653.

Dr. Dixon stated: "slow deterioration of cervical spondylosis, lateral humeral epicondylitis and left wrist degenerative osteoarthritis." (AT 190.)

### C. Summary of the ALJ's Findings

The ALJ conducted the required five-step evaluation and concluded that plaintiff was not disabled within the meaning of the Act. At step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since October 11, 2003, the alleged date of onset. (AT 19.) At step two, the ALJ concluded that plaintiff had the following severe impairments: "cervical degenerative disc disease, lower back pain due to lumbar degenerative disease and left elbow lateral humeral epicondylitis." (AT 20.) At step three, he determined that plaintiff's impairments, whether alone or in combination, did not meet or medically equal any impairment listed in the applicable regulations. (AT 20.) The ALJ further determined that prior plaintiff had the residual functional capacity ("RFC") to perform a limited range of light exertional work. (AT 16, 18-19.) In particular, the ALJ found the following:

> [The claimant] can stand and walk for six hours and lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can occasionally bend and stoop and he should avoid constant use of the left upper extremity for reaching and handling. The claimant should also avoid constant use of the right upper extremity for reaching.

(AT 20.) In doing so, the ALJ considered, but did not adopt, the medical opinion of Dr. Dixon, who had opined that plaintiff was more functionally limited than the ALJ's RFC reflected. (AT 17-18.) At step four, the ALJ found that plaintiff was capable of performing past relevant work as a driving instructor, but stated that "[t]his work does not require the performance of work-related activities precluded by the [plaintiff's] residual functional capacity (20 CFR 404.1520(f))." (AT 20.) Because of the finding at step four, the ALJ did not reach step five of the inquiry.

## II. ISSUES PRESENTED

Although plaintiff contends that the ALJ committed two errors in reviewing plaintiff's claim, he really alleges three errors. First, plaintiff argues that the ALJ erred by

7

<00>
<00><00><00><00>
<00><00><00><00><00>
<00>

rejecting the opinion of Dr. Dixon, a treating physician, without providing "specific and legitimate" reasons for doing so. (Pl.'s Mot. for Summ. J. at 11-15.) Second, he argues that because of the ALJ's error in rejecting Dr. Dixon's opinion, the ALJ failed to include limitations in the RFC that he was required to include. (Id. at 16.) Finally, plaintiff argues that the ALJ erred by not using the services of a vocational expert in determining whether plaintiff was capable of performing his past work or other work in the national economy.

III.   STANDARDS OF REVIEW

The court reviews the Commissioner's decision to determine whether it is (1) free of legal error, and (2) supported substantial evidence in the record as a whole. Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009); accord Vernoff v. Astrue, 568 F.3d 1102, 1105 (9th Cir. 2009). This standard of review has been described as "highly deferential." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009). "'Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); accord Valentine, 574 F.3d at 690 (citing Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988)). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews, 53 F.3d at 1039; see also Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."). Findings of fact that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); see also McCarthy v. Apfel, 221 F.3d 1119, 1125 (9th Cir. 2000). "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's." Bray, 554 F.3d at 1222 (citing Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir.2007)); see also Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld.") (quoting Burch v.

8

1  Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).  However, the court "must consider the entire
2  record as a whole and may not affirm simply by isolating a 'specific quantum of supporting
3  evidence.'"  Ryan, 528 F.3d at 1198 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882
4  (9th Cir. 2006)); accord Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

IV.     ANALYSIS

        A.     The ALJ Provided Specific and Legitimate Reasons for Not Adopting Dr. Dixon's Medical Opinion Regarding Plaintiff's Limitations.

Plaintiff's primary contention is that the ALJ erred by discounting or rejecting Dr. Dixon's medical opinion regarding plaintiff's functional limitations without articulating "specific and legitimate" reasons for doing so.  (Pl.'s Mot. for Summ. J. at 11-15.)  The Commissioner argues that the ALJ properly rejected Dr. Dixon's opinion by providing numerous specific and legitimate reasons that are supported by substantial evidence in the record.  (Def.'s Opp'n & Cross-Motion for Summ. J. at 6-10.)

The medical opinions of three types of medical sources are recognized in social security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  Lester, 81 F.3d at 830.  Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  Id. Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.  Id.  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.  Id. at 830-31; accord Valentine, 574 F.3d at 692.  "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting

9

1   clinical evidence, stating [her] interpretation thereof, and making findings.'" Tommasetti, 533

2   F.3d at 1041 (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989)).

3         Here, Dr. Dixon was plaintiff's treating physician, and his medical opinion

4   regarding plaintiff's functional limitations was contradicted by the opinions of other medical

5   opinions in the record.  (See AT 16-18.)  As a result, the ALJ was required to articulate specific

6   and legitimate reasons for rejecting Dr. Dixon's opinion.  Broadly stated, the ALJ found that Dr.

7   Dixon's assessment of plaintiff was "incompatible with a conservative treatment regimen,

8   contrary to his own progress note and inconsistent with the remainder of the record."  (AT 17.)

9   The ALJ also provided several specific reasons for rejecting Dr. Dixon's opinion, which are

10  addressed in turn below.

11        First, the ALJ stated that Dr. Dixon's conclusion that plaintiff could not sustain a

12  an eight-hour workday was contradicted by Dr. Dixon's own assessment that plaintiff was not

13  limited in sitting, standing, or walking during a workday.  (AT 17; see AT 188 (stating that

14  plaintiff has no limitations as to sitting, standing, or walking in an eight-hour workday, but also

15  that plaintiff can only perform light work for two hours in an eight-hour workday).)  As the ALJ

16  determined, these conclusions are facially inconsistent, and inconsistencies in a medical report or

17  opinion are relevant evidence that may constitute a specific and legitimate reason for not

18  accepting the opinion.  See Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602-03 (9th

19  Cir. 1999) (stating that internal inconsistencies within medical reports constitute evidence

20  relevant to the discounting of that opinion); Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir.

21  1992) (holding that the presence of inconsistencies and ambiguities in a medical opinion

22  constituted specific and legitimate reasons for not adopting it); cf. Weetman v. Sullivan, 877 F.2d

23  20, 23 (9th Cir. 1989) (holding that medical opinion may be properly rejected where it is

24  inconsistent with contemporaneous medical notes made during an examination).  Plaintiff does

25

26

not directly confront this apparent contradiction in his motion for summary judgment.[11]

Second, the ALJ reasoned that Dr. Dixon's opinion that plaintiff would have to lie down frequently to relieve back pain was internally inconsistent with his indication that "the claimant had chronic pain at a level of 4, which is clearly not indicative of severe or disabling levels of pain to preclude all work activities." (AT 17.)  Again, this is a specific and legitimate reason for not adopting Dr. Dixon's opinion.  Plaintiff counters that his worst pain was at a level of seven, that he experienced chronic pain at a level of four, that Dr. Dixon never stated that plaintiff's pain "was only a level four as indicated by the ALJ," and that plaintiffs' pain was worse with activity.  (Pl.'s Mot. for Summ. J. at 12.)

The undersigned's task is not to re-weigh the evidence in the record; it is to determine whether the ALJ's decision is supported by substantial evidence and free of legal error.  Also, the undersigned must review the ALJ's express reason for not adopting the medical opinion and determine whether it was specific and legitimate.  Here, the ALJ did not discount Dr. Dixon's statement that plaintiff's *worst* pain was at a level seven.  Instead, he drew an inference based on evidence in the record that plaintiff's *chronic* pain at a level of four was not indicative of pain that precluded all work activities.  An ALJ is permitted to draw such an inference from the record and, accordingly, the undersigned finds that this is a specific and legitimate reason for discounting Dr. Dixon's opinion.  See Tommasetti, 533 F.3d at 1038 ("The ALJ's findings will be upheld 'if supported by inferences reasonably drawn from the record . . . .'") (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004)); Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (stating that "the ALJ is entitled to draw inferences 'logically flowing from the evidence'" (citation omitted)).

Third, the ALJ noted that "Dr. Dixon . . . mentioned the claimant did not require

---

[11] Plaintiff does argue that the need to lie down three to four times a day is "entirely consistent" with a limitation to part-time work regardless of plaintiff's ability to sit, stand, or walk.  (Pl.'s Mot. for Summ. J. at 12.)  However, this argument does not directly address any of the ALJ's express reasons for discounting Dr. Dixon's opinion.

any medications for his impairments" and that the response on Dr. Dixon's assessment form that plaintiff was taking no medications at the time of the assessment appeared to be "contrary to the extreme restrictions reported by Dr. Dixon." (AT 17; see also AT 190.) He also commented that Dr. Dixon's treatment regimen had been "entirely conservative with no referrals for other modalities of treatment such as physical therapy, pain management, chiropractic manipulation or acupuncture."[12] (AT 17.) Plaintiff contends that the ALJ's statement regarding the fact that plaintiff was taking medications at the time of Dr. Dixon's assessment is erroneous because Dr. Dixon had previously requested epidural injections, prescribed a medication called Indocin, and administered injections for plaintiff's left elbow and wrist pain. (Pl.'s Mot. for Summ. J. at 12.) Plaintiff also states that he had adverse reactions to epidural and cortisone injections, and that he managed his pain with medical marijuana prescribed to him. (Id.)

From all of this, plaintiff draws the erroneous conclusion that the ALJ's comment that Dr. Dixon's statement that plaintiff was not presently taking prescribed medications suggested that plaintiff "did not experience pain." (Pl.'s Mot. for Summ. J. at 12:24-26.) But that was not the ALJ's conclusion. The ALJ concluded that the fact that plaintiff was not taking medication at the time of Dr. Dixon's limitations assessment and had otherwise conservative treatment was inconsistent with the extreme restrictions reported by Dr. Dixon. A conservative course of treatment relative to a finding of total disability is a proper basis for discounting the extreme restrictions reported by a treating physician. Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001). Thus, the ALJ's conclusion that plaintiff's treatment was relatively conservative is a specific and legitimate reason to not adopt Dr. Dixon's functional assessment.

Fourth, the ALJ explained that Dr. Dixon's indication that plaintiff would have difficulty with forward flexion and frequent rotation of the neck was contradicted by the fact that plaintiff had "demonstrated full motion of the neck on several occasions." (AT 17; see also AT

---

[12] Plaintiff has not challenged this statement regarding alternative treatment modalities.

12

188 (Dr. Dixon's statement that plaintiff had a limitation on "forward flexion frequent rotation of his neck at all times").) Plaintiff argues that this is not a specific and legitimate reason for discounting Dr. Dixon's assessment because Dr. Dixon's findings regarding neck movement were consistent with his diagnosis of a C5-6 herniated disc with impingement on the left C5 and/or C6 nerve root, and that diagnosis was supported by MRI results. (Pl.'s Mot. for Summ. J. at 13 (citing AT 192, 199, 201.) Despite plaintiff's speculation about what limitations he might have based on a general definition of disc herniation,[13] plaintiff has not demonstrated *why* the ALJ erred by finding that Dr. Dixon's treatment notes reflecting that plaintiff had full range of motion as to his neck conflicted with his assessment that plaintiff would have trouble with forward flexion and neck rotation at all times. Dr. Dixon noted that plaintiff had full range of motion with respect to his neck over the entire course of treatment.[14] (See AT 195 (April 30, 2007 physical examination), 200 (February 14, 2006 physical examination.) Plaintiff has not persuasively countered the ALJ's conclusion that Dr. Dixon's assessment and treatment notes were contradictory. See, e.g., Valentine, 574 F.3d at 692-93 (holding that a contradiction between treating physician's opinion and treatment notes constitutes a specific and legitimate reason for discounting that opinion). Accordingly, substantial evidence in the record supports the ALJ's finding.

---

[13] Plaintiff includes the following in his motion:

> "A herniated disc in the neck can cause neck pain, radiating arm pain, shoulder pain, and numbness or tingling in the arm or hand. The quality and type of pain can vary from dull, aching, and difficult to localize to sharp, burning, and easy to pinpoint. Pain in your arms as well as in your neck is usually the first sign that your nerve roots are irritated by a problem in your neck." See, http://www.medtronic.com/your-health/cervical-herniated-discs/index.htm.

(Pl.'s Mot. for Summ. J. at 13 n.1.)

[14] Moreover, Dr. Dixon stated that plaintiff's neck pain was manageable with medication (AT 195). See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for . . . benefits.").

13

Fifth, the ALJ stated that although Dr. Dixon had diagnosed plaintiff with osteoarthritis of the left hand, diagnostic evidence failed to confirm that diagnosis. (AT 17.) Specifically, the ALJ noted that "radiographs of the left hand and elbow performed by Dr. Dixon showed no evidence of calcific deposits or bony abnormalities consistent with osteoarthritis," which undermined Dr. Dixon's opinion that plaintiff was limited in lifting, fingering, handling and reaching due to osteoarthritis of the left hand. (AT 17; see also AT 198 (Dr. Dixon's treatment notes stating that "X-rays of his elbow and wrist show no calcific deposits and no bony abnormalities present").) Citing only medical informational web sites, plaintiff argues that the ALJ's reason is not specific and legitimate because x-rays showing bony abnormalities and calcific deposits are not conditions precedent to a diagnosis of osteoarthritis.[15] (See Pl.'s Mot. for Summ. J. at 13.)

The undesigned concludes that the ALJ's reason premised on the x-ray results is not a supported reason because, on the face of the decision, it appears that the ALJ acted as a de facto physican and conducted his own diagnosis of plaintiff (or discounted Dr. Dixon's) based on the x-ray records. The ALJ did not cite to a conflicting medical opinion stating that x-rays revealing bony abnormalities and calcific deposits are necessary to a diagnosis of osteoarthritis. Similarly, he did not provide the basis for his conclusion that bony abnormalities and calcific deposits are prerequisites to a diagnosis of osteoarthritis. Thus, the undersigned cannot properly evaluate the basis of the ALJ's reasoning in this regard.

Sixth, the ALJ rejected Dr. Dixon's report that plaintiff was restricted in handling and fingering with the right hand on the grounds that Dr. Dixon's progress notes did not reflect any treatment for right hand weakness or pain, which would warrant limitations in use of the right hand. (AT 17 (noting as well that "[t]reatment records supplied by Dr. Dixon fail to

---

[15] The undersigned has not considered the web sites listed by plaintiff in assessing this reason provided by the ALJ. These types of citations to general informational web sites, with no supporting basis for the legitimacy of the web site or the information contained therein, are not particularly helpful to the court in assessing an ALJ's decision.

document any abnormalities involving the right hand or wrist").) Plaintiff is correct that on February 14, 2006 (plaintiff's first visit with Dr. Dixon), Dr. Dixon noted in the "history" portion of his treatment notes that plaintiff had "C5-6 nerve root impingement, particularly on the right," and that plaintiff was "having numbness and tingling that goes down into his thumb and index finger and it still gives him a moderate amount of pain at all times." (AT 200.) However, the ALJ is correct in that plaintiff had several more visits with Dr. Dixon over the following fourteen months, and Dr. Dixon's treatment notes—including notes of a visit made on the same day that Dr. Dixon filled out the functional assessment form—make no further mention of pain in the right hand or related treatment. (See AT 195-98.) Accordingly, the ALJ's reason is supported by substantial evidence in the record and is thus a legitimate basis for not accepting Dr. Dixon's functional assessment.

Although not all of the ALJ's reasons for not adopting Dr. Dixon's opinion are supported, the overwhelming majority were specific, legitimate, and supported by substantial evidence in the record. Accordingly, the undersigned concludes that the ALJ did not err in discounting Dr. Dixon's functional assessment.

At the tail end of his argument regarding the discounting of Dr. Dixon's opinion, plaintiff makes three brief, additional arguments. Plaintiff first argues that the ALJ erred by relying on the opinions and evidence provided by a treating chiropractor and a workers compensation chiropractor because "chiropractors are not acceptable medical sources." (Pl.'s Mot. for Summ. J. at 15 (citing 20 C.F.R. § 404.1513).) Plaintiff's argument is misleading and misstates 20 C.F.R. § 404.1513. Section 404.1513 provides that a chiropractor is not an acceptable medical source for the purpose of establishing whether a claimant has a medically determinable impairment, i.e., at step two of the five-step analysis. See 20 C.F.R. § 404.1513(a). However, that same regulation states that the Commissioner may use evidence from medical sources including chiropractors to assess the severity of an impairment and how it affects the claimant's ability to work. Id. § 404.1513(d)(1). Thus, the regulation does not stand for the

proposition forwarded by plaintiff that the ALJ erred by relying on the chiropractors' opinions at all, and the ALJ did not err in considering evidence from the chiropractors.

Plaintiff next argues, without any citation to legal authority, that the ALJ erred by considering Dr. McIntire's November 2005 report, which he characterizes as "quite stale." (Pl.'s Mot. for Summ. J. at 15.)  The fact that Dr. McIntire's opinion is older than Dr. Dixon's opinion does not render it is less reliable or incapable of serving as substantial evidence in support of the ALJ's decision.  Without more from plaintiff, the undersigned concludes that the ALJ did not err in considering Dr. McIntire's opinion.

Plaintiff also contends, again citing no legal authority, that the ALJ erred by considering Dr. McIntire's opinion because Dr. McIntire did not have before him all of plaintiff's medical records.  (Pl.'s Mot. for Summ. J. at 15; see also AT 169 (Dr. McIntire's report stating that he did not have plaintiff's radiographic or imaging reports).  Again, without more, the undersigned cannot conclude that Dr. McIntire's report is evidence that the ALJ was not entitled to consider along with other evidence in the record.  Moreover, the ALJ did not rely exclusively on Dr. McIntire's opinion in assessing plaintiff's abilities.

### B.   The ALJ Did Not Err in Formulating the RFC.

Citing no legal authority, plaintiff argues that the ALJ erred in formulating plaintiff's RFC as a result of the erroneous rejection of Dr. Dixon's treating opinion.  (Pl.'s Mot. for Summ. J. at 16.)  Specifically, he asserts that the ALJ's error in rejecting Dr. Dixon's opinion resulted in the ALJ committing an additional error by not including the following limitations found by Dr. Dixon in the RFC: that plaintiff could not work full time, would need to lie down three to four times during the day, and could rarely use his left hand and arm to handle and reach, and could only occasionally use his right hand and arm to finger and handle.  (Id.)  The Commissioner contends, in essence, that plaintiff's argument fails because the ALJ properly rejected Dr. Dixon's opinion.  (Def.'s Opp'n & Cross-Motion for Summ. J. at 10.)

The undersigned agrees with the Commissioner.  Plaintiff's argument that the ALJ

1  incorrectly formulated plaintiff's RFC is entirely contingent on the success of his argument that
2  the ALJ erred by not adopting Dr. Dixon's medical opinion.  Because the undersigned has
3  already concluded that the ALJ provided specific and legitimate reasons for not adopting Dr.
4  Dixon's opinion regarding plaintiff's functional limitations, plaintiff's argument regarding the
5  proper formulation of the RFC fails.

C.      The ALJ Was Not Required to Use A Vocational Expert at Step Four.

Finally, plaintiff argues that the ALJ erred by not using the services of a vocational expert to determine whether plaintiff could perform his past work "where the medical evidence *suggests* that a claimant's impairments *may* amount to a nonexertional impairment." (Pl.'s Mot. for Summ. J. at 16 (emphasis in original) (citing Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001)).)  The Commissioner counters that the ALJ may, but is not required to, use a vocational expert at step four and that Bruton is not applicable here.  (Def.'s Opp'n & Cross-Motion for Summ. J. at 10-11.)

The applicable regulation provides that an ALJ *may* consult a vocational expert to determine whether the claimant can return to his or her past work.  See 20 C.F.R. § 404.1560(b)(2) ("We *may* use the services of vocational experts or vocational specialists . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity" (emphasis added).).  However, the regulations do not *require* an ALJ to do so.  Case law is in accord that at step four an ALJ's determination that a claimant can perform past work need not be supported by the testimony of a vocational expert.[16]  See Mathews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) (holding that because the claimant "failed to show that he was unable to return to his previous job as a receiving clerk/inspector, the burden of proof remained with [the claimant]" and "[t]he vocational expert's testimony was thus useful,

---

[16] In addition, to the extent that plaintiff's argument is contingent on the undersigned finding that the ALJ erred by not adopting Dr. Dixon's medical opinion, that argument fails because the undersigned has concluded that the ALJ did not err in this regard.

17

1  but not required"); accord Campos v. Astrue, 565 F. Supp. 2d 1179, 1184 (C.D. Cal. 2009); see
2  also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996) (holding that the ALJ's determination
3  that the claimant could perform past work made it unnecessary for the ALJ to call a vocational
4  expert at step five).[17]  Accordingly, plaintiff has not demonstrated that the ALJ erred by not
5  consulting with a vocational expert.

6  Morever, Bruton is inapplicable here.  In Bruton, the ALJ determined at step four
7  that the claimant could not perform his past work and, at step five, determined that the claimant
8  could perform the full range of light work relying on the Medical-Vocational Guidelines (also
9  referred to as the "grids") instead of soliciting the testimony of a vocational expert.  268 F.3d at
10 826.  The Ninth Circuit Court of Appeals held that the ALJ erred by relying on the grids and not
11 calling a vocational expert to determine whether the Commissioner had borne its burden at step
12 five to show that claimant could perform other jobs in the national economy.  See id. at 827-28.
13 It reasoned that there was evidence of "significant non-exertional impairments,"[18] which made
14 reliance on the grids inappropriate under Circuit precedent.  Id. at 828.

15 Bruton is distinguishable from the present case.  This case does not involve the
16 ALJ's determination at step five or his application of the grids.  Plaintiff's challenge is directed at
17 the ALJ's step four determination that plaintiff could perform his past work, not the step five
18 determination that plaintiff could perform other work in the national economy.  Moreover,

---

[17] See also Hopkins v. Astrue, 227 Fed. App. 656, 657 (9th Cir. 2007) ("Although the vocational expert's testimony support's Hopkins's position, the ALJ was not required to call a vocational expert at step four.").  Decisions of this court, albeit unpublished, are also in accord. See, e.g., Phongsuwan v. Astrue, No. CIV S-08-2193 GGH, 2010 WL 796969, at *8 (E.D. Cal. Mar. 5, 2010) (unpublished) ("The ALJ may consider the testimony of a vocational expert to determine if plaintiff can do his past relevant work; however, the ALJ is not required to call such an expert at the fourth step" (citations omitted).)

[18] Exertional limitations relate to "primary strength activities" such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  See 20 C.F.R. § 416.969a(b); Cooper v. Sullivan, 880 F.2d 1152, 1155 n.6 (9th Cir. 1989).  Nonexertional limitations include mental, sensory, postural, manipulative, and environmental limitations that do not directly affect primary strength activities.  See 20 C.F.R. § 416.969a(c); Cooper, 880 F.2d at 1156 n.7.

plaintiff has the burden at step four, which distinguishes a case like <u>Bruton</u>, which involved a determination at step five where the Commissioner has the burden.  Thus, plaintiff's reliance on <u>Bruton</u> is misplaced, and the undersigned will not impose additional obligations on the ALJ that are not required by applicable law.

Accordingly, plaintiff's argument regarding the use of a vocational expert is unpersuasive.  The ALJ did not commit error at step four.

V. <u>CONCLUSION</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment or remand is denied;

2. The Commissioner's cross-motion for summary judgment is granted; and

3. Judgment be entered in favor of the Commissioner.

DATED:  April 28, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE